**E-Filed 9/1/10**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| JAMES FREDDIE CAVITT, | Case Number C 05-3064 JF |
| Petitioner, | **AMENDED ORDER[2] DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| VINCE CULLEN, Warden,[1] | |
| Respondent. | |

## I. PROCEDURAL BACKGROUND

On October 29, 1997, a San Mateo Superior Court jury convicted Petitioner James

Freddie Cavitt ("Cavitt") of first degree murder (Cal. Pen. Code § 187)[3]; first degree robbery (§§

211, 212.5(a)); first degree burglary (§§ 489, 460(a)); conspiracy (§ 182(a)(1)); and grand theft of

---

[1]Cullen is sued in place of the originally named defendant, Jeanne S. Woodford.

[2] This disposition is not designated for publication in the official reports.

[3] Unless otherwise specified, all further statutory citations are to the California Penal Code.

1   a firearm (§ 487).  In addition, the jury sustained findings that the murder had been committed
2   under the special circumstances of robbery and burglary (§ 190.2(a)(17)(i) and (ii)) and that
3   Cavitt personally inflicted great bodily injury during the commission of the murder, robbery, and
4   burglary (§§ 1203.075(a)(1), (a)(2), (a)(5); § 12022.7).  On January 15, 2002, the trial court
5   sentenced Cavitt to an indeterminate term of twenty-five years to life.  The judgment was
6   affirmed by the California Court of Appeal in an unpublished opinion filed February 5, 2002.
7   Cavitt then sought review by the California Supreme Court, which granted review and affirmed
8   the convictions in an opinion issued July 21, 2004.  *People v. Cavitt*, 33 Cal. 4th 187 (Cal. 2004).
9
10      Cavitt filed the instant federal petition on July 28, 2005, asserting the following grounds
11  for relief:  (1) "the trial court violated his Fifth, Sixth, and Fourteenth Amendment rights to due
12  process and trial by jury by excluding crucial exonerating evidence"; (2) the trial court violated
13  his Fifth, Sixth, and Fourteenth Amendment rights to due process and trial by jury "by giving
14  erroneous instructions on the connection between homicide and the underlying felony which
15  must be proved before a burglar or robber may be convicted of felony murder for a homicide
16  committed by a confederate"; and (3) "the California Supreme Court compounded the violations
17  of those rights by rendering the elements of California's felony murder rule unconstitutionally
18  vague."  (Habeas Pet. 4.)
19      On March 28, 2007, the Court granted Respondent's motion to dismiss the petition for
20  failure to exhaust state remedies as to the third ground for relief and stayed the action pending
21  further action by the California Supreme Court.  (*See* Dkt. No. 7.)  Following the state supreme
22  court's denial of relief, this Court reopened the case and reissued its previous order to show
23  cause.  (*See* Dkt. No. 13.)  The Court heard oral argument on June 25, 2010.

## II.  FACTUAL BACKGROUND

25      The following facts are taken from the California Supreme Court's published opinion
26  affirming the convictions of Cavitt and his co-defendant Robert Williams:

27  Case No. C 05-3064 JF
    ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
28  (JFLC3)                                              2

1       Defendant James Cavitt started dating Mianta McKnight in January 1995.
2   Mianta's father, Philip, and her stepmother, Betty, disapproved of the relationship.
    Concerned about Mianta's late-night dating and her high school truancy, Philip
3   insisted that Mianta move from Oakland, where she had been living with Philip's
    niece, back to Brisbane to live with him and Betty.  He hoped this would keep her
    away from Cavitt.
4       After moving back to Brisbane in November 1995, Mianta became upset
    that Philip and Betty did not allow her to go on dates with Cavitt.  Her
5   relationship with Betty in particular had been rocky for some time, and she often
    told her schoolmates that she hated Betty.
6       Around the end of November 1995, 17-year-old Mianta, 17-year-old
    Cavitt, and Cavitt's friend, 16-year-old defendant Robert Williams, developed a
7   plan to burglarize the McKnight house, where Mianta was then living.  The plan
    was to enter the house with Mianta's assistance, tie up Betty, and steal what they
8   could find.  The three scheduled the burglary-robbery for December 1.  On that
    afternoon, Mianta purchased rope and packing tape on the way home from school.
9   Later on, she placed a bed sheet outside the house and left the side door unlocked.
10      Around 6:30 p.m., Williams and Cavitt drove together to the McKnight
    house.  They were wearing black clothes, gloves, and hockey masks and were
11  carrying duct tape.  Between 7:00 and 7:15 p.m., Mianta met them at the side
    door, gave them the rope she had just bought, and told them Betty was upstairs in
12  bed.  All three went upstairs.  Cavitt and Williams threw the sheet over Betty's
    head.  While Cavitt secured the sheet around Betty's head with duct tape,
13  Williams fastened Betty's wrists together with plastic flex cuffs.  Then they used
    the rope to bind her ankles and wrists together with the sheet, creating a kind of
14  hood for Betty's head.  During the process, Cavitt and Williams also punched
    Betty in the back with their fists to get her to be quiet.  Betty sustained extensive
15  bruising to her face, shoulders, arms, legs, ankles and wrists, consistent with blunt
    force trauma.
16      After Betty was immobilized, Cavitt, Williams, and Mianta ransacked the
    bedroom, removing cash, cameras, Rolex watches, jewelry, and two handguns.
17  Before leaving, Cavitt and Williams pretended to bind Mianta and placed her on
    the bed next to Betty.  Cavitt and Williams each claimed that Betty was still
18  breathing, although with difficulty, when they left her, facedown on the bed.
19      After Mianta freed herself, she turned Betty over onto her back.  Mianta
    claimed she removed duct tape from Betty's mouth.  Betty did not move and did
20  not appear to be breathing. Mianta called her father to tell him they had been
    robbed.  She also told him Betty was unconscious.  Philip immediately reported
21  the incident to the Brisbane Police Department at 7:44 p.m.  When the dispatcher
    called the McKnight house at 7:45 p.m., Mianta claimed that robbers had entered
22  the house while she was downstairs watching television, had put a sheet over her
    head, and had knocked her unconscious; that she was eventually able to free
    herself; that she had called her father to report the crime; and that her stepmother
23  was unconscious.
24      Brisbane police arrived at 7:52 p.m. Betty was on her back on the bed.
    She was not breathing and had no pulse.  Her hands were bound behind her, and
25  her wrists and ankles were tied together with a rope.  Officers attempted
    cardiopulmonary resuscitation.  Paramedics obtained a heartbeat at 8:11 p.m., but
26  Betty had already suffered severe and irreversible brain injury.  She was
    pronounced dead the next morning.  The cause of death was insufficient oxygen,
    or anoxia, caused by asphyxiation.  The injuries she sustained were a contributing
    cause.
27  Case No. C 05-3064 JF
    ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
28  (JFLC3)                                              3

1

2          During conversations with police and a neighbor, Mianta reiterated her
       claim that unidentified robbers had somehow entered the house, that they had
3      wrapped her in a sheet and knocked her unconscious, and that she had been unable
       to untie herself until after the robbers left, at which point she discovered that her
4      stepmother was unconscious.  When police secured Philip's consent to conduct a
       polygraph of his daughter, however, Mianta eventually confessed to her
5      involvement in the burglary-robbery.  Cavitt and Williams were arrested on
       December 2 and also confessed.  While being transported to juvenile hall, Cavitt
       said to Williams, "Man, we fucked up. We should have just shot her."
6          Police found the stolen jewelry, cameras, and handguns at Cavitt's home,
       as well as black clothing, gloves, and hockey masks.
7          Cavitt and Williams, who were tried separately, contended that Mianta
       must have killed Betty after they had left and for reasons unrelated to the
8      burglary-robbery.  To that end, they offered evidence tending to show that Mianta
       hated her stepmother, that Mianta had expressed to her schoolmates a desire to
9      kill her stepmother, and that Betty could have been suffocated after Cavitt and
       Williams had returned to Cavitt's home with the loot.

10     *Cavitt*, 33 Cal. 4th at 194-95.

11                            **III.  LEGAL STANDARD**

12         Where, as here, the habeas petition was filed after the effective date of the Anti-Terrorism

13     and Effective Death Penalty Act ("AEDPA"), a petitioner:

14         can prevail on a claim 'that was adjudicated on the merits in State court' only if he
           can show that the adjudication:  (1) resulted in a decision that was contrary to, or
15         involved an unreasonable application of, clearly established Federal law, as
           determined by the Supreme Court of the United States; or (2) resulted in a
16         decision that was based on an unreasonable determination of the facts in light of
           the evidence presented in the State court proceeding.

17

18     *Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) (citing 28 U.S.C. § 2254(d)).

19         "A state court decision will be 'contrary to' federal law if it 'applies a rule that contradicts

20     the governing law set forth in [Supreme Court] cases' or 'confronts a set of facts that are

21     materially indistinguishable from' a Supreme Court case yet reaches a different result."  *Id*.

22     (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  "It will involve an 'unreasonable

23     application of' federal law only if it is 'objectively unreasonable.'"  *Id*. (quoting *Williams*, 529

24     U.S. at 409).  The state court decision tested under these standards is the decision of the highest

25     state court to provide a reasoned decision on the merits.  *Id*.  If the state court decision was

26     contrary to, or involved an unreasonable application of, clearly established Supreme Court

27     Case No. C 05-3064 JF
       ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
28     (JFLC3)                                              4

1   authority, the federal court must resolve the constitutional claim without the deference that the

2   AEDPA otherwise requires. *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008). However, even

3   if it finds constitutional error by the state court, this Court will grant habeas corpus relief only if

4   it finds that the error "had substantial and injurious effect or influence in determining the jury's

5   verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted).

## IV. DISCUSSION

### A.   California Supreme Court's "Logical Nexus" Construction

8          Cal. Pen. Code § 189 defines felony murder as "[a]ll murder . . . which is committed in

9   the perpetration of, or attempt to perpetrate [enumerated felonies including robbery and

10  burglary]." At trial, Cavitt requested a jury instruction that in order for a non-killer accomplice

11  to be convicted of felony murder, the killer must have committed the homicide "in furtherance

12  of" the underlying felony or felonies. The trial court rejected the proposed instruction.

13         On appeal, the California Supreme Court affirmed the trial court's rejection of Cavitt's

14  proposed instruction. At the same time, the court rejected the state's argument that "it is enough

15  that the act resulting in death occurred at the same time as the burglary and robbery." *Cavitt*, 33

16  Cal. 4th at 196. After reviewing California case law, the court held that:

17              California law thus has long required some logical connection between the
            felony and the act resulting in death, and rightly so. Yet the requisite connection
18          has not depended on proof that the homicidal act furthered or facilitated the
            underlying felony. Instead, for a nonkiller to be responsible for a homicide
19          committed by a cofelon under the felony-murder rule, there must be a *logical
            nexus*, beyond mere coincidence of time and place, between the felony the parties
20          were committing or attempting to commit and the act resulting in death.

21  *Id.* at 201 (emphasis added). In so holding, the court concluded that a proper application of the

22  complicity aspect of the felony murder rule would "exclude homicidal acts that are completely

23  unrelated to the felony for which the parties have combined, and to require instead a logical

24  nexus between the felony and the homicide beyond a mere coincidence of time or place." *Id.*

25  The court held that because "the felony-murder rule does not require proof that the homicidal act

26  furthered or facilitated the felony," and because the "in furtherance" language "has the potential

27  Case No. C 05-3064 JF
    ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
28  (JFLC3)                                          5

to sow confusion if used in the instructions to the jury," the trial court did not err in rejecting Cavitt's proposed instruction.  *Id.* at 202-03 (citation omitted).  Cavitt argues that this holding was contrary to clearly established law both because the "logical nexus" formulation is unconstitutionally vague and because adopting the formulation constituted an unforeseeable enlargement of accomplice liability that was applied retroactively to him.  (Pet'r's Reply 9.)

### 1.   Vagueness

The void-for-vagueness doctrine requires that  "[t]o satisfy due process, 'a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'"  *Skilling v. United States*, 130 S.Ct. 2896, 2904 (2010) (citing *Kolender v. Lawson*, 461 U. S. 352, 357 (1983)).  The Supreme Court also has recognized that "deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language."  *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964).

Cavitt contends that the "logical nexus" formulation of accomplice liability under the felony murder rule is unconstitutionally vague because the term "has no generally accepted meaning at all" and because the state supreme court failed "to describe the causal connection on which complicity in felony murder depends."  (Pet'r's Reply 19.)  He argues that the court's failure to define the term "logical nexus" "makes the determination a wholly subjective one for the trier of fact; it allows each juror to answer the question based on whatever he or she thinks 'logical nexus' means."  (*Id.* at 20.)  Cavitt also claims that the vagueness of the "logical nexus" formulation, and its retroactive application, deprived him of his due process right to fair notice. Cavitt's argument requires this Court to accept the premise that "until the state Supreme Court decided *Cavitt*, the long-established rule was that non-killer burglary accomplices were not guilty of felony murder if the homicide was not committed to facilitate or advance the burglary."  (*Id.* at 21.)

1    "The United States Supreme Court has made clear that 'it is not the province of a federal

2    habeas court to reexamine state court determinations on state law questions.'" (Resp. Memo. 5

3    (citing *Estelle v. McGuire*, 502 U.S. 62, 68-69 (1991)).  This Court agrees that a federal habeas

4    action is not the proper vehicle for challenging the California Supreme Court's interpretation of

5    state law.  "Our concern is with [the petitioner's] federal rights."  *Langford v. Day*, 110 F.3d

6    1390, 1388 (9th Cir. 1996).  Even if it were, the Court does not agree that the "logical nexus"

7    requirement renders § 189 unconstitutionally vague.  While it did not define the term in detail,

8    the state supreme court explained that the connection between the underlying felony and the act

9    resulting in death must be "more than mere coincidence of time and place," and that a non-killer

10   accomplice's liability for felony murder turns on "the existence of objective facts that connect the

11   act resulting in death to the felony the nonkiller committed or attempted to commit."  *Cavitt*, 33

12   Cal. 4th at 196, 205.  Particularly when viewed with the deference required by the AEDPA, this

13   understanding of the complicity aspect of the felony-murder rule is sufficiently unambiguous that

14   both jurors and potential defendants can comprehend its meaning.

15         **2.       Retroactive Application**

16   "[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively,

17   operates precisely like an ex post facto law, such as Art. I, s 10, of the Constitution forbids."

18   *Bouie*, 378 U.S. at 353.  Cavitt argues that "even if the [California Supreme Court's] ['logical

19   nexus'] formulation of the [felony murder complicity] rule were not unconstitutionally vague, its

20   application to Cavitt's case violated due process because 'an unforeseeable . . . construction of a

21   state law by the courts may not be retroactively applied to a defendant.'" (Pet'r's Reply 25 (citing

22   *Clark v. Brown*, 442 F.3d 708, 721 (2006) (citation omitted)).)  The merit of this argument thus

23   depends on the accuracy of Cavitt's assertion that "in 1995, when Betty McKnight was killed, the

24   established construction of the complicity rule held that non-killer accomplices were not guilty of

25   murder unless the fatal act was committed in furtherance of the felony, and the Supreme Court

26   had given no indication it was reconsidering that construction."  (*Id.*)  Respondent contends that

27   Case No. C 05-3064 JF
     ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

28   (JFLC3)                                    7

1   the California Supreme Court "did not unforeseeably expand a non-killer's liability for felony

2   murder pursuant to California Penal Code section 189, it simply rejected petitioner's asserted

3   limitation on liability." (Resp. Memo. 10.)  In particular, Respondent points to the court's

4   conclusion that a requirement that the homicide be committed "in furtherance of" a felony was

5   not supported by the statutory text or the legislative history.

6          "The beginning point for a *Bouie* analysis is the statutory language at issue, its legislative

7   history, and judicial constructions of the statute."  *Webster v. Woodford*, 369 F.3d 1062, 1069

8   (9th Cir. 2004) (as amended).  Cal. Pen. Code § 189 defines felony murder as "[a]ll murder . . .

9   which is committed in the perpetration of, or attempt to perpetrate [enumerated felonies

10  including robbery and burglary]."  As with the felony-murder special circumstance statute at

11  issue in *Clark*, if the state supreme court's decision at issue here "had been written on a clean

12  slate, it would not constitute a due process violation, or indeed anything close to it."  *Clark*, 442

13  F.3d 708.

14         Here, of course, the court was not writing on a clean slate.  Indeed, the California

15  Supreme Court has considered the issue of vicarious liability under the felony-murder rule on

16  multiple occasions.  The court reviewed the history of this aspect of its jurisprudence in *People v.*

17  *Pulido*, 15 Cal.4th 713 (Cal. 1997):

18         [W]e have on many occasions discussed the scope of a robber or other
           felon's liability for a killing committed by a confederate.  As shown below, our
19         descriptions of an accomplice's liability have limited complicity to killings
           occurring while the killer was acting in furtherance of a criminal purpose common
20         to himself and the accomplice, or while the killer and accomplice were jointly
           engaged in the felonious enterprise.
21         . . .
           Our earliest statement of the complicity of one robber in a murder
22         committed by another appears to have been in *People v. Vasquez* (1875) 49 Cal.
           560 (hereafter *Vasquez*).  A man had been shot to death during the robbery of a
23         store.  Vasquez admitted his participation in the robbery, but testified the shot had
           been fired by another of the robbers, without Vasquez's approval or assistance.
24         On appeal from his first degree murder conviction, Vasquez complained of the
           following jury instruction: "'It is no defense to a party associated with others in,
25         and engaged in a robbery, that he did not propose or intend to take life in its
           perpetration, or that he forbade his associates to kill, or that he disapproved or
26         regretted that any person was thus slain by his associates. If the homicide in
           question was committed by one of his associates engaged in the robbery, in
27  Case No. C 05-3064 JF
    ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
28  (JFLC3)                                          8

furtherance of their common purpose to rob, he is as accountable as though his own hand had intentionally given the fatal blow, and is guilty of murder in the first degree.'" (*Id*. at pp. 562-563.) We held the instruction accurately stated the law under section 189, although we declined to elaborate, observing merely that "no argument is required to sustain it, as a clear and correct statement of the law on that point." (*Id*. at p. 563; *accord*, *People v. Lawrence* (1904) 143 Cal. 148, 157 [76 P. 893] [*Vasquez* instruction correctly states "the rule of absolute responsibility of a party for a homicide committed by his associates in furtherance of their common purpose to rob."].)

In another early case, *People v. Olsen* (1889) 80 Cal. 122 [22 P. 125] (hereafter *Olsen*), overruled on other grounds in *People v. Green* (1956) 47 Cal.2d 209, 227, 232 [302 P.2d 307], we approved an instruction that, while similar to the Vasquez instruction, was more general in not being limited to robberies: "'If a number of persons conspire together to commit a felony, and take the life of another person in the prosecution of the common design, it is murder in all, although only one may have inflicted the fatal blow, the others being present aiding and abetting.'" (80 Cal. at p. 124.)   The defendant complained the instruction failed to inform the jury the killing must have been the "'ordinary and probable effect'" of the felonious scheme, and not a "'fresh and independent product'" of the killer's mind. (*Id*. at p. 125.)  Rejecting this argument, we held the instruction, by limiting complicity to a killing committed "in the prosecution of the common design," adequately excluded killings foreign to the contemplated crime or crimes. (*Ibid*., italics in original.)

In *People v. Washington*, []62 Cal.2d 777 [(Cal. 1965)] (hereafter *Washington*), we examined the scope of section 189's robbery-murder rule with some care, ultimately holding the rule did not apply to a killing committed by someone other than the robber or robbers. (62 Cal.2d at p. 783.)  In *Washington*, we described a robber's complicity as follows: "A defendant need not do the killing himself, however, to be guilty of murder.  He may be vicariously responsible under the rules defining principals and criminal conspiracies. All persons aiding and abetting the commission of a robbery are guilty of first degree murder when one of them kills while acting in furtherance of the common design." (*Id*. at pp. 781-782.)

Other *post-Vasquez* descriptions of complicity in robbery murder under section 189 are worded in a rather different manner.  In both *People v. Perry* (1925) 195 Cal. 623, 637-638 [234 P. 890] (hereafter *Perry*) and *People v. Martin*, [] 12 Cal.2d [466, at] 472 [(Cal. 1938]] (hereafter *Martin*), we stated the rule as follows: "[I]f a human being is killed by any one of several persons jointly engaged at the time of such killing in the perpetration of or an attempt to perpetrate the crime of robbery, whether such killing is intentional or unintentional, or accidental, each and all of such persons so jointly engaged in the perpetration of, or attempt to perpetrate such crime of robbery, are guilty of murder of the first degree." (*Accord*, *People v. Waller* (1939) 14 Cal.2d 693, 703 [96 P.2d 344]; *People v. Hutchinson* (1967) 254 Cal.App.2d 32, 38-39 [61 Cal.Rptr. 868]; *People v. Ray* (1962) 210 Cal.App.2d 697, 700 [26 Cal.Rptr. 825].)  This formulation, unlike the *Vasquez* instruction, does not require that the killing have been "in furtherance of the common purpose to rob," although it does require the killer and accomplice be jointly engaged, at the time of the killing, in a robbery.

As this review demonstrates, our formulations of the rule establishing complicity of one robber in another robber's homicidal act have varied in their precise language and perhaps in the exact scope of complicity intended.  One line

1

2

3

4

5

6

7

8

9

10

of cases echoes, verbatim or with relatively minor variation, the *Vasquez* formulation–the killing must be committed "in furtherance of their common purpose to rob." (*Vasquez*, *supra*, 49 Cal. at p. 563; *see Washington*, *supra*, 62 Cal.2d at p. 783 [killing "must [have been] committed by the defendant or by his accomplice acting in furtherance of their common design"]; *Olsen*, *supra*, 80 Cal. at p. 124 [complicity for killing committed "'in the prosecution of the common design.'"].) *Martin* and *Perry*, on the other hand, appear to state a broader rule of felony-murder complicity, under which the killing need have no particular causal or logical relationship to the common scheme of robbery; accomplice liability attaches, instead, for any killing committed while the accomplice and killer are "jointly engaged" in the robbery. (*See also Perry*, *supra*, 195 Cal. at p. 638 [robbery, rather than killing, must be "in furtherance of a common purpose"]; *People v. Waller*, *supra*, 14 Cal.2d at p. 703 [same].) One lower court has explicitly distinguished the two complicity rules, holding that, regardless of the lack of a causal link between robbery and killing, accomplice liability for felony murder is established, as in *Martin* and *Perry*, whenever "the killing is done during the perpetration of a robbery in which they were participating." (*People v. Cabaltero* (1939) 31 Cal.App.2d 52, 61 [87 P.2d 364], italics added (hereafter *Cabaltero*).)

11   *Pulido*, 15 Cal.4th at 720-22. The *Pulido* court declined to choose one formulation over the

12   other, holding that "[u]nder neither of the approaches described above . . . does complicity in a

13   felony murder extend to one who joins the felonious enterprise after the killing has been

14   completed." *Id.* at 722; *see People v. Smithson*, 79 Cal. App. 4th 480, 501 (Cal. Ct. App. 2000)

15   ("[B]ecause the *Pulido* court did not disapprove either line of felony-murder cases, both are still

16   valid and we are duty-bound to comply with the Supreme Court's directives in each.").

17         With respect to legislative history, the court has held that:

18

19

20

21

22

23

24

25

Once a person has embarked upon a course of conduct for one of the enumerated felonious purposes, he comes directly within a clear legislative warning–if a death results from his commission of that felony it will be first degree murder, regardless of the circumstances. (10) This court has reiterated numerous times that "The purpose of the felony-murder rule is to deter felons from killing negligently or accidentally by holding them strictly responsible for killings they commit." (*People v. Washington* (1965) 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130].) The Legislature has said in effect that this deterrent purpose outweighs the normal legislative policy of examining the individual state of mind of each person causing an unlawful killing to determine whether the killing was with or without malice, deliberate or accidental, and calibrating our treatment of the person accordingly. Once a person perpetrates or attempts to perpetrate one of the enumerated felonies, then in the judgment of the Legislature, he is no longer entitled to such fine judicial calibration, but will be deemed guilty of first degree murder for any homicide committed in the course thereof.

26   *People v. Burton*, 6 Cal. 3d 375, 388-89 (Cal. 1971), *superseded on other grounds by*

27   Case No. C 05-3064 JF
     ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

28   (JFLC3)                                    10

1   *constitutional amendment as stated in People v. Brazille*, No. E026946, 2001 WL 1423739 (Cal.

2   Ct. App. 2001).

3       In its decision in the instant case, the court acknowledged the formulations described in

4   *Pulido*, but rejected both sides' arguments with respect to the implication of its earlier decisions:

5           We therefore reject the assumption–shared by both parties–that the "'in
        furtherance'" (*e.g.*, *Vasquez*, *supra*, 49 Cal. at p. 563) and "jointly engaged" (*e.g.*,
6           *People v. Martin*, *supra*, 12 Cal.2d at p. 472, 85 P.2d 880) formulations articulate
        opposing standards of felony-murder liability.  The latter does not mean–as the
7           Attorney General suggests–that mere coincidence of time and place between the
        felony and the homicide is sufficient.  And the former does not require–as
8           defendants suggest–that the killer intend the homicidal act to aid or promote the
        felony.  Rather, *Vasquez* and *Martin* have merely used different words to convey
9           the same concept: to exclude homicidal acts that are completely unrelated to the
        felony for which the parties have combined, and to require instead a logical nexus
10          between the felony and the homicide beyond a mere coincidence of time or place.

11  *Cavitt*, 33 Cal. 4th at 201.  The court also cited the above passage from *Burton*, holding that

12  "[t]he purpose of the felony-murder rule is to deter those who commit the enumerated felonies

13  from killing by holding them strictly responsible for any killing committed by a cofelon, whether

14  intentional, negligent, or accidental, during the perpetration of the felony."  *Id.* at 197.

15      The criminal conduct upon which Cavitt's conviction is based occurred in 1995.  At the

16  time, both the *Vazquez* and *Martin/Perry* formulations of accomplice liability under the felony-

17  murder rule were valid.  *See Pulido*, 15 Cal.4th at 720-22 (explaining the state of the law on the

18  issue in 1997 with no indication of change between 1995 and 1997); *People v. Smithson*, 79 Cal.

19  App. 4th at 501.  Accordingly, the court's construction of § 189 in Cavitt's case, which attempted

20  to reconcile the two seemingly opposing formulations, was not "unexpected and indefensible by

21  reference to the law which had been expressed prior to the conduct in issue," as prohibited by the

22  United States Supreme Court in *Bouie*.  *Bouie*, 378 U.S. at 354; *compare Bouie*, 378 U.S. at 356

23  (granting habeas petition where "[t]he interpretation given the statute by the South Carolina

24  Supreme Court in the *Mitchell* case, . . . so clearly at variance with the statutory language, has not

25  the slightest support in prior South Carolina decisions"), *with Moore v. Rowland*, 367 F.3d 1199,

26  1200 (9th Cir. 2004) (per curiam) (holding that retroactive application of a state supreme court's

27

28

1   decision did not violate due process where lower appellate courts were divided on the relevant

2   issue at the time of the criminal conduct and the court merely "selected among two existing lines

3   of authority").  Nor did the construction "'make an action done before the passing of the law, and

4   which was innocent when done, criminal; and punish such action,' or '[]aggravate a crime, or

5   make it greater than it was, when committed.'" *Id.* at 353 (citation omitted).

6   **B.    Trial Court's Felony-Murder Instructions**

7          "[T]he Due Process Clause protects the accused against conviction except upon proof

8   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

9   charged." *In re Winship*, 397 U.S. 358, 364 (1970).  As he did on direct appeal, Cavitt contends

10  that the jury instructions failed to apprise the jury of the requirements for complicity under the

11  felony-murder rule.  Specifically, Cavitt contends that "the jury instructions in this case said that

12  felony murder complicity required nothing more than a temporal connection between the felony

13  and the homicide."  (Pet'r's Reply 33.)

14         The three instructions relevant to this issue are the following:

15         1.  The unlawful killing of a human being, whether intentional, unintentional or
           accidental, which occurs during the commission or as a direct causal result of
16         robbery or burglary, is murder of the first degree when the perpetrator had the
           specific intent to commit that crime.  The specific intent to commit robbery or
17         burglary and the commission of such crime must be proved beyond a reasonable
           doubt.  **CALJIC 8.21.**

18
           2.  A killing is committed in the commission of a felony if the killing and the
19         felony are part of one continuous transaction.  There is no requirement that the
           homicide occur while committing or while engaged in the felony or that the
20         killing be part of a felony other than that the two acts be part of one continuous
           transaction.  **People's Special Instruction #2.**

21
           3.  If a human being is killed by one of several persons engaged in the commission
22         of the crimes of robbery or burglary, all persons who either directly and actively
           commit the act constituting that crime or who, with knowledge of the unlawful
23         purpose of the perpetrator of the crime and with the intent or purpose of
           committing, encouraging or facilitating the commission of the offense, aid,
24         promote, encourage or instigate by act or advice its commission, are guilty of
           murder in the first degree, whether the killing is intentional, unintentional, or
25         accidental.  **CALJIC 8.27.**

26         In rejecting Cavitt's direct appeal with respect to the sufficiency of the instructions,

27
28

1  Justice Baxter, writing for the majority, explained:

2      The instructions adequately apprised the jury of the need for a logical nexus
       between the felonies and the homicide in this case.  To convict, the jury
3      necessarily found that "the killing occurred during the commission or attempted
       commission of robbery or burglary" by "one of several persons engaged in the
4      commission " of those crimes."  [sic]  The first of these described a temporal
       connection between the crimes; the second described the logical nexus.  A burglar
5      who happens to spy a lifelong enemy through the window of the house and fires a
       fatal shot . . . may have committed a killing while the robbery and burglary were
6      taking place but cannot be said to have been "engaged in the commission" of
       those crimes at the time the shot was fired.

7

8  *Cavitt*, 33 Cal. 4th at 203.  In a concurrence joined by Justice Kennard, Justice Werdegar wrote

9  that in her view the term "engaged in the commission" "is calculated only to inform the jury of

10 the necessary temporal connection between the predicate felony and the murder, not of the

11 necessary causal or logical connection."  *Id.* at 211.  However, Justice Werdegar explained that

12 the failure to give a clearer instruction was harmless in Cavitt's case because "there was no

13 substantial evidence to support the theory that Mrs. McKnight's killing was logically or causally

14 unrelated to the conspirators' commission of burglary and robbery, in which defendants Cavitt

15 and Williams were full participants."  *Id.* at 212.

16     Notwithstanding the fact that they concurred in the judgment affirming his conviction,

17 Cavitt urges this Court to adopt the reasoning of Justices Werdegar and Kennard as a basis for

18 concluding that his rights to due process and trial by jury were violated.  He also argues that the

19 California Supreme Court "invaded the province of the jury" by choosing not to let a jury decide

20 whether a "logical nexus" between the felony and the killing existed.  (Pet'r's Reply 35.)

21 Respondent argues that even if the instructions were ambiguous as to the "logical nexus"

22 requirement, the ambiguity could not have had a substantial or injurious effect sufficient to

23 entitle Petitioner to relief under *Brecht*.  Respondent cites the following passage from the state

24 supreme court's opinion:

25     This is not a situation in which Mianta just happened to have shot and killed her
       lifelong enemy, whom she coincidentally spied through the window of the house
26     during the burglary-robbery. [citation omitted]  Betty, the murder victim, was the
       intended target of the burglary-robbery.  As part of those felonies, Betty was

27 Case No. C 05-3064 JF
   ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
28 (JFLC3)                                        13

1   covered in a sheet, beaten, hog-tied with rope and tape, and left facedown on the
    bed.  Her breathing was labored at the time defendants left.  These acts either
2   asphyxiated Betty in themselves or left her unable to resist Mianta's murderous
    impulses.  Thus, on this record, one could not say that the homicide was
3   completely unrelated, other than the mere coincidence of time and place, to the
    burglary-robbery. [footnote omitted]
4

5   *Cavitt*, 33 Cal. 4th at 204.

6          This Court need not determine whether the trial court erred in failing to instruct the jury if

7   it concludes that such error was harmless under *Brecht*.  To obtain relief based on an

8   instructional error, a habeas petitioner must "show that the alleged instructional error had

9   substantial and injurious effect or influence in determining the jury's verdict."  *Clark*, 450 F.3d at

10  905 (citations and internal quotation marks omitted).  "A 'substantial and injurious effect' means

11  a 'reasonable probability' that the jury would have arrived at a different verdict had the

12  instruction been given."  *Byrd v. Lewis*, 566 F.3d 855, 860 (9th Cir. 2009) (citing *Clark*, 450 F.3d

13  at 916).  "To decide whether [Cavitt] was prejudiced, we consider: (1) the weight of evidence

14  that contradicts the defense; and (2) whether the defense could have completely absolved the

15  defendant of the charge."  *Id.* (citation omitted).

16         Here, as all of the justices of the California Supreme Court agreed, there was substantial

17  evidence in the record that the burglary-robbery and the killing were logically connected "beyond

18  a mere coincidence of time or place."  *See Cavitt*, 33 Cal. 4th 187, 204 ("[T]he evidence here did

19  not raise an issue as to the existence of a logical nexus between the burglary-robbery and the

20  homicide . . . ."); *id.* at 212 (Werdegar, J., concurring) ("[T]here was no substantial evidence to

21  support the theory that Mrs. McKnight's killing was logically or causally unrelated to the

22  conspirators' commission of burglary and robbery, in which defendants Cavitt and Williams

23  were full participants." (citing *id.* at 204)).  Cavitt's only evidence to the contrary is that Mianta

24  hated Betty and killed her because of her personal animus toward her.  Even conceding this was

25  true and that Mianta's true intention always had been to kill Betty following her co-conspirators'

26  departure, the Court cannot conclude that there is a reasonable probability that the jury would

27  Case No. C 05-3064 JF
    ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
28  (JFLC3)                                        14

1   have acquitted Cavitt of first degree murder if it had received a clearer instruction with respect to

2   the "logical nexus" requirement.  As the state supreme court explained:

3
            One would hardly be surprised to discover that targets of inherently
4           dangerous felonies are selected precisely *because* one or more of the participants
            in the felony harbors a personal animus towards the victim. But it would be novel
5           indeed if that commonplace fact could be used to exculpate the parties to a
            felonious enterprise of a murder committed in the perpetration of that felony,
6           where a logical nexus between the felony and the murder exists. . . .  Defendants'
            focus on the killer's subjective motivation thus is not merely contrary to the
7           felony-murder rule but would in practice swallow it up.

8   *Cavitt*, 33 Cal. 4th at 205 (emphasis in original).

9   **C.     Trial Court's Exclusion of Evidence of Mianta's Hatred of Her Stepmother**

10          Four of Mianta's classmates testified at trial that Mianta had told them that she hated her

11  stepmother and wanted to kill her.  Over Cavitt's objection, the trial court ruled that the

12  classmates' testimony was admissible only with respect to the robbery-murder and burglary-

13  murder special circumstances and not with respect to the felony murder charge.  As he did on

14  direct appeal, Cavitt claims that the trial court's limiting instruction violated his Fifth, Sixth, and

15  Fourteenth Amendment Rights.

16          The California Supreme Court held that even if the limiting instruction were erroneous,

17  the error was harmless:

18
            Evidence that Mianta wanted to kill Betty, even if credited, would not
19          have affected the undisputed logical nexus between the burglary-robbery and the
            homicide.  That connection was based on the fact that the crimes involved the
20          same victim, occurred at the same time and place, and were each facilitated by
            binding and gagging Betty.  Evidence that Betty was intentionally murdered by
21          Mianta because of a private grudge, instead of killed accidentally or killed
            intentionally to facilitate the burglary-robbery, would not have undermined that
22          connection.  Hence, the exclusion of this evidence from the jury's consideration,
            even if error, could not have been prejudicial.
23              On the other hand, evidence that Mianta had a private motive was relevant
            to the jury's determination that the homicide and the burglary-robbery were part of
24          a single continuous transaction.  Nonetheless, it is not reasonably probable that the
            result would have been different had the testimony of Mianta's schoolmates been
25          admitted without the limiting instruction.  As stated, the jury was permitted to use
            this testimony in considering the robbery-murder and burglary-murder special
26          circumstances.  In order to find the special circumstances true, the jury necessarily
            found that the murder was committed "during the commission of or in order to
            carry out or advance the commission of the crimes of robbery or burglary or to
27  Case No. C 05-3064 JF
    ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
28  (JFLC3)                                          15

1  facilitate the escape therefrom or to avoid detection."  Accordingly, the jury,
2  despite this testimony, found either that the homicide was committed "during the
   commission" of the burglary-robbery or that it was designed to facilitate those
3  crimes or the escape therefrom.  Either finding demonstrates that the homicide
   was part of a continuous transaction with the burglary-robbery.  Moreover, despite
4  the admission of this same testimony for all purposes, [Cavitt's co-Defendant]
   Williams's jury convicted him of felony murder.
5          The likelihood of prejudice was further diminished by the fact the jury did
6  hear from other witnesses that Mianta's relationship with Betty was poor, that she
   was angry with Betty, and (from Cavitt himself) that Mianta wanted to kill Betty.
   None of this testimony was subject to the limiting instruction concerning the
7  testimony of Mianta's schoolmates.  In sum, Cavitt cannot show prejudice.

8  *Cavitt*, 33 Cal. 4th at 209-10.

9          Cavitt contends that the limiting instruction was highly prejudicial because the evidence

10 tended to prove that Mianta killed her stepmother not to "further" the commission of the robbery

11 or burglary but because of personal animus.  He also argues that "[e]ven if the court had

12 instructed in the terms of the 2004 'logical nexus' formulation . . . it is still reasonably probable

13 the jury would have concluded that Betty's death could be considered a 'fresh and independent'

14 act by Mianta which was 'logically' *disconnected* from the joint felonies."  (Pet'r Reply 33

15 (footnote omitted) (emphasis in original).)  The former argument is dependent upon a

16 determination that the state supreme court's rejection of the "in furtherance" requirement was

17 erroneous, which it was not.  The state supreme court explicitly rejected the latter argument,

18 holding that "the felony-murder rule renders it unnecessary to examine the individual state of

19 mind of each person causing an unlawful killing – which is precisely what the 'fresh and

20 independent product' limitation would require courts to do."  *Cavitt*, 33 Cal. 4th at 205 n.6.

21         Cavitt points out correctly that "the state must provide [the court] with a 'fair assurance'

22 that the error was harmless under *Brecht*."  (Pet'r's Reply 38 (citation omitted).)  For reasons

23 similar to those discussed above in Section IV.B., the Court concludes that Respondent has done

24 so, particularly in light of the state supreme court's detailed analysis.  Given the other evidence

25 that was admitted without limitation, the jury's findings with respect to the special

26 circumstances, and the verdict in Williams' case (in which use of the classmates' testimony was

27
28 Case No. C 05-3064 JF
   ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
   (JFLC3)                                    16

1   not limited), the Court concludes that even assuming *arguendo* that the limiting instruction was

2   given in error, such error was harmless under *Brecht* and does not warrant habeas corpus relief.

3                                    **V. ORDER**

4        Good cause therefor appearing, the petition for writ of habeas corpus is DENIED.  The

5   Clerk shall enter judgment and close the file.

6        The federal rules governing habeas cases brought by state prisoners have been amended

7   to require a district court that denies a habeas petition to grant or deny a certificate of

8   appealability ("COA") in its ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C.

9   foll. § 2254 (effective December 1, 2009).  Petitioner has not shown "that jurists of reason would

10  find it debatable whether the petition states a valid claim of the denial of a constitutional right

11  [or] that jurists of reason would find it debatable whether the district court was correct in its

12  procedural ruling."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a COA will be

13  denied.

14

15

16

17  Dated:  9/1/10

18                                    JEREMY FOGEL
                                      United States District Judge

19

20

21

22

23

24

25

26

27  Case No. C 05-3064 JF
    ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
28  (JFLC3)                                17